UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION


PREMIER ENTERTAINMENT BILOXI, LLC ,          PLAINTIFF/COUNTER-DEFENDANT
doing business as Hard Rock Hotel & Casino Biloxi, a
Delaware limited liability company

U. S. BANK NATIONAL ASSOCIATION                         INTERVENOR/PLAINTIFF

V.                                                      CIVIL ACTION NO. 1:06cv12-LTS-RHW

JAMES RIVER INSURANCE COMPANY               DEFENDANT/COUNTER-CLAIMANT


**<u>MEMORANDUM OPINION</u>**

INTRODUCTION

By [86] Order dated February 7, 2007,  the Court held in abeyance rulings on Premier
Entertainment Biloxi, LLC's (Premier) [52] Motion to Dismiss James River Insurance
Company's (James River) Counterclaim; Premier's [54] Motion for Partial Judgment on the
Pleadings; and James River's [61] Motion for Partial Summary Judgment.  Premier's [52]
Motion to Dismiss and [54] Motion for Partial Judgment on the Pleadings were converted to
motions for summary judgment, and the Court determined that the case was not in a position for
summary disposition.  The principal parties were ordered to participate in Court-sponsored
mediation (which was unsuccessful), to attend the subsequently scheduled settlement conference
(likewise to no avail), and to continue the discovery process.  It was also incumbent on Premier
and James River, at the appropriate time, to mutually submit to the Court "what material facts
exist without substantial controversy and what material facts are actually and in good faith
controverted." Fed. R. Civ. P. 56(d).

Premier and James River have attempted to comply with the Court's directions.  Prior to
the oral argument held July 13, 2007, on the [52][54][61] motions, the Court was advised of the
following  agreed statement of issues to be decided (the wording of the enumerated language is
the Court's):

       1.  Whether Premier's primary policy of insurance insures against loss caused by
or resulting from a named storm under that policy's Weather Catastrophe Occurrence
(WCO) provision;

       2.  Whether James River's excess policy issued to Premier (which contains
"follow-form" language) incorporates the primary policy's WCO terms and conditions;
and

3.   Whether the flood exclusion of the James River excess policy applies to the damage sustained by the casino barge (which was situated over water and not dry land) as a result of Hurricane Katrina.

It is the parties' belief that these legal puzzles can be assembled without reference to any disputed fact.  However, this does not mean that there are no disputed facts, and the Court's analysis must take into account factual issues raised by the respective arguments.  While the Court is skeptical that a pure exercise of interpreting insurance contracts will magically resolve this dispute, and still adheres to a strong aversion to piecemeal consideration (especially in a vacuum) of any litigation, it will attempt nevertheless to address the above and any other related issues raised by the three motions.

## FACTUAL BACKGROUND

Premier operates the Hard Rock Hotel and Casino in Biloxi, Mississippi, which just before opening its doors to the public sustained serious damage from Hurricane Katrina on August 29, 2005.  Only two weeks before this, insurance coverage on the casino property was made effective.

Premier is the named insured under three layers of insurance protection:  a primary policy issued by Industrial Risk Insurers (IRI), and two layers of excess coverage supplied by several insurers.  James River is in the third layer, and the amount of its coverage is in the amount of $14 million.  It is also the Court's understanding that Premier has settled with all involved excess carriers in some negotiated fashion and not necessarily for policy limits.

Premier and James River presented four stipulated exhibits for the Court's review: the IRI binder, the IRI policy, the James River binder, and the James River policy.  They will be discussed in turn.

The IRI binder has a page primarily dedicated to deductibles, with, among others, a basic deductible, one applicable to flood, and one for a WCO.  There is a page with a list of other policy terms and conditions.  Potentially relevant here is that the IRI flood definition includes surface water, and that the WCO wording applies.  A blanket section on WCO reads:

> All loss or damage occurring during a period of 72 consecutive hours which is caused by or results from a storm or weather disturbance which is named by the National Weather Service or any other recognized meteorological authority. Storm or weather disturbance includes all weather phenomenon associated with or occurring in conjunction with the storm or weather disturbance, including, but not limited to flood, wind, hail, sleet, tornadoes, hurricane or lightning.

Just below the WCO language is a section called Revisions to Flood Endorsement, which will be discussed in more detail *infra*.  Finally, there is a docks, piers, wharves exclusion revision, which is:

Exclusion A.6 of Section II of Property Damage Coverage Part A is revised as follows:

A.6 docks, piers, wharves and other property located thereon when caused by action of water or ice or impact of watercraft unless such loss or damage is caused by a [WCO] as defined elsewhere in this policy.

The James River binder, dated August 3, 2005, is a short document.  Its highlights are the perils insured ("All Risk of Direct Physical Loss excluding Earthquake & Flood"), and additional comments ("**Bound subject to receipt of a completed copy of tax letter and a copy of the primary policy (due within 60 days).  You have elected to reject coverage for acts of terrorism as defined by TRIA** [Terrorism Risk Insurance Act]**")**.  (Bold in original).

 The Court now gets to the insurance policies issued by IRI and James River.  The IRI policy comes in at more than 70 pages.  In respect to the issues before the Court, it is a hodgepodge.  The heading of the declarations page is "Comprehensive All Risk Form."  The policy has a flood annual aggregate sublimit (which shall not exceed $25,000,000) related to "liability for all losses in any one policy year as insured against by the Flood Endorsement." Among the deductibles is one for WCO ("The amount to be deducted for each [WCO] as insured against by this policy shall be the sum of 3 per cent of the one hundred (100%) combined PD [Property Damage] Value and TE [Time Element] Value at all locations where physical loss or damage occurs.  In no event shall the amount to be deducted from the total loss be less than $500,000 Property Damage and Time Element combined.").  There is a stand-alone WCO provision that is identical to the one in the binder quoted *supra*.

Curiously, there is also a definition revision for a WCO cross-referenced to a general conditions section that does not appear to be in the policy provided to the Court.  Adding to the confusion in this same revisions section is one related to earthquake and flood exclusions (among those events excluded are the all-too familiar waves, tidal water or tidal waves, and overflow of streams or other bodies of water, all whether driven by wind or not (and all whether or not naturally occurring)), subject to endorsement, and the revision to the docks, piers, and wharves exclusion  (again, in the language of the binder, *supra*).  And the Court is just getting to the flood endorsement, with its own definitions, exclusions, and revisions, and the exclusions and revisions thereto all occur within the very same flood endorsement.

The entire Flood Endorsement to the IRI policy (with an effective date of August 15, 2005) is:

A.  In consideration of increased premium and subject to all terms, conditions and stipulations of the policy to which this endorsement is attached, not in conflict herewith, this policy is extended to insure against loss or damage caused by flood as defined herein to covered property.  Paragraphs D.2 and D.3. of Section II of the General Conditions portion of this policy [already revised once] are deleted.

B.  Definition–The term "flood" shall mean a general and temporary condition of

partial or complete inundation of normally dry land areas from: 1. the overflow of inland or tidal waters; 2. the unusual and rapid accumulation or runoff of surface waters from any source; or 3. mudslide or mud flow caused by accumulation of water on or under the ground.

C.  Limit and Deductible–Coverage provided under this endorsement is subject to the limit(s) of liability and deductible amount(s) shown under the Declarations.

D.  This endorsement does not increase any amounts or limits of insurance provided by this policy.

Additional Exclusions

E.  This endorsement does not insure against loss or damage to:

    1.  retaining walls, seawalls, bulkheads, wharves, piers, bridges, docks or other structures located on or partially over water, or personal property in the open;

    2.  property at any location covered under the provisions of the Newly Acquired Property clause (III.B.) in the General Conditions.

Special Terms and Conditions

1.  Paragraph B. of this endorsement is hereby deleted and the following is substituted:

    B.  Definition–The term "flood" shall mean:

        1.  A general and temporary condition of partial or complete inundation of normally dry land areas from:

            (a) the overflow of inland or tidal waters;

            (b) the unusual and rapid accumulation or runoff of surface waters from any source; or

            (c) mudslide or mud flow caused by accumulation of water on or under the ground.

        2.  the release of water impounded by a dam;

        3.  water that backs up or flows from a sewer, drain, or sump.

2.  This endorsement does not insure against loss or damage to property covered

under any Miscellaneous Unnamed Location provision in the policy.

3.  Loss or damage caused by flood shall include all covered loss or damage to covered property resulting directly or indirectly from flood, except loss or damage from resulting Fire or loss or damage otherwise excluded by this endorsement.

4.  Paragraph E. of this endorsement is hereby deleted and the following substituted:

E.  This endorsement does not insure against loss or damage to:

1.  retaining walls, seawalls, bulkheads, wharves, piers, bridges, docks or other structures located on or partially over water, **except for the Casino building**, or personal property in the open;

2.  property at any location covered under the provisions of the Newly Acquired Property clause (III.B.) in the General Conditions.

(Bold in original).

Now arriving at James River's much shorter commercial property policy, under description of covered property, the declarations page indicates that it is for "All Risk of Direct Physical Loss or Damage, excluding Earthquake and Flood.  Covering Real and Business Personal Property and Business Income, as more fully defined in the forms attached."  Under the heading of EXCESS PROPERTY COVERAGE FORM is a parenthetical with the words FOLLOWING FORM in it.  The Covered Causes of Loss are virtually the same as on the declarations page: "All Risk of Direct Physical Loss or Damage excluding Earthquake and Flood, except as otherwise excluded herein."

The third exclusion of Section III of the policy, Exclusions, is Land or Water, and provides that "This policy does not cover land (including land on which covered property is located) or water."  A separate FLOOD EXCLUSION states:

It is agreed that coverage, as provided under this policy, does not extend to the peril of Flood, defined as follows:

Whenever in the Policy the term "Flood" occurs, it shall be held to mean a general and temporary condition of partial or complete inundation of normally dry land areas from:

a.  The overflow of inland or tidal waters;

b.  The unusual and rapid accumulation or runoff of surface waters from any source or spray from any of the foregoing;

     c.  Mudslides that are caused or precipitated by accumulation of
water on or under the ground.

At the bottom of the flood exclusion are the words ALL OTHER TERMS AND CONDITIONS
OF THE POLICY REMAIN UNCHANGED.

     Another key provision of the James River excess policy is in the INSURING
AGREEMENT:

     This Company will pay for direct physical loss or damage to Covered Property
caused by or resulting from any Covered Cause of Loss in excess of coverage
provided by the primary and underlying policy(ies) covering the identical Covered
Property.

     This Policy shall follow the terms, definitions, conditions and exclusions of [the]
primary policy .  .  .  issued by [IRI], subject to the policy period, policy limits,
premiums and all other terms, definitions, conditions and exclusions of this
Policy.  If any provisions of the underlying policy(ies) conflict with any provisions
with this policy, the provisions of this Policy will apply.  In no event will this
Policy provide broader coverage than that provided by the primary and underlying
insurer(s).

     This Policy will apply only after the primary and underlying Insurer(s) have paid
the full amount of their respective "ultimate net loss" liability as set forth herein.

     The penultimate section to be quoted from the James River excess policy is the Limits of
Insurance:

     The most this Company will pay for loss or damage arising from any one "loss
occurrence" is 11% of the "ultimate net loss" excess of $50,000,000 "ultimate net
loss" to the Insured in each and every "loss occurrence," except the total limit of
recovery under this Policy shall not exceed the lesser of the following:

     a. $14,000,000 part of $131,000,000 per occurrence excess of $50,000,000
per occurrence.

     b.  No Coverage Provided per occurrence and in the annual aggregate as
respects all flood losses in any single one year period commencing with
the effective date of this Policy.

     c.  No Coverage Provided per occurrence and in the annual aggregate as
respects all earthquake losses in any single one year period commencing
with the effective date of this Policy.

     d.  The interest of the Insured.

Finally, there is the definition of ULTIMATE NET LOSS: "The term 'ultimate net loss' shall mean the actual loss sustained by the Insured as a direct result of the perils insured against by this Policy after making deductions for all salvages, recoveries and other valid and collectible insurance other than recoveries under this Policy and the policy(ies) of the primary and underlying excess insurer(s)."

## LEGAL DISCUSSION

Premier basically offers a two-fold proposition: 1) that the WCO language in the primary policy is incorporated into James River's excess policy, which does not contain a specific exclusion for WCO; and 2) regardless of the WCO language, James River has a limited or partial flood exclusion that does not extend to the casino barge. Some of this is based on the fact of James River having "follow form" language in its policy. Of course, it could be said that following IRI's form is akin to singing along with Mitch Miller–the bouncing ball may at once exclude coverage, then provide it, then take it away again, only to give it back, all within the same form of the policy and without a change in font. Premier also argues that the James River policy is at least ambiguous to the extent of its flood language, and such ambiguity favors coverage.

James River contends that the WCO language is limited, particularly in its tie-in to the IRI WCO deductible, and that its own excess policy clearly and unambiguously excludes any claims for flood damage. James River also posits that it did not issue a true "follow form" policy, and that the "follow form" language is itself limited in that it provides for exclusions of its own (in this case, flood); that, in the event of conflicts between the primary policy and its excess policy, the latter controls; and that its policy expressly provides that in no event will its coverage be broader than the policies of the primary and other excess insurers.

It is true that the interpretation of the terms of an insurance policy presents questions of law, not fact. *Gore v. American Motorists Insurance Co.*, 441 F.2d 10 (5th Cir. 1971); *United States Fidelity and Guaranty Co. v. Omnibank*, 812 So. 2d 196 (Miss. 2002). It is also well established that the terms of an insurance policy are to be interpreted under the rules of construction generally applicable to written contracts, and where the terms of an insurance policy are clear and unambiguous, they are to be enforced as written. *Farmland Mutual Insurance Co. v. Scruggs*, 886 So. 2d 714 (Miss. 2004); *Shaw v. Burchfield*, 481 So. 2d 247 (Miss. 1985). On the other hand, any ambiguity in the terms of an insurance policy is to be resolved in favor of the insured and against the insurer who drew the contract. *Williams Life Insurance Company of Georgia*, 367 So. 2d 922 (Miss. 1979). And an insurance contract is to be considered as a whole, and each of its provisions should be given a reasonable interpretation that is, to the extent possible, consistent with the other terms of the contract. *Glantz Contracting Co. v. General Electric Co.*, 379 So. 2d 912 (Miss. 1980).

Of course, probably the most complicating factor in the instant case is that there are two policies to review. If both sides are to be believed, the interpretation of just the IRI primary and James River excess policies is cast as a black and white proposition, when it appears to be obvious that only shades of gray are actually involved, taking into account facts extrinsic to the

contracts themselves.

The James River policy has what is known as a "follow the form" provision, which is more commonly associated with reinsurance agreements. In that context, which is instructive, its purpose

> is to create a large measure of symmetry between the scope of coverage of the reinsurance agreement and the scope of coverage of the policy or policies being reinsured. Unless otherwise agreed between the reinsurer and the ceding insurer, "a policy of reinsurance will be construed as offering the same terms, conditions and scope of coverage as exist in the reinsured policy."

14 Holmes' Appleman on Insurance 2d § 102.5 (2000) (footnote and citation omitted).

It should never be concluded "that reinsurance coverage is necessarily coextensive with coverage of the underlying insurance policy that is reinsured. While 'follow the form' provisions seek to minimize the divergence, the specific terms and conditions of the reinsurance contract always govern." *Id.* at § 106.1.

The observation has been made that

> [a] contract of reinsurance is to be interpreted according to the general rules of construction as would be used in interpreting any contract of insurance. Among these general rules are: 1) making reasonable interpretations of the terms, 2) avoiding strained or absurd constructions, 3) interpreting words according to their commonly accepted and ordinary meaning, and 4) making appropriate reference to custom and usage.
>
> A contract of reinsurance should be interpreted in light of the entire transaction between the contracting parties, including reference to all of the terms and provisions of the contract, to ensure that the contract is equal to the intentions of the parties. The court should interpret an insurance contract as a whole in order to ascertain the intent of the parties and should take into account the subject matter of the contract, the circumstances under which it was made and the purpose sought to be achieved by the parties. Where the parties have expressed their intent in plain and unambiguous contract terms, the language must be given its ordinary and common meaning without further construction. In construing the contract, the use of the word reinsurance is not determinative of the nature of the contract.

1A Couch on Insurance 3d § 9:13 (2005).

These rules are not unlike those followed in Mississippi as outlined above.

A significant difference between reinsurance and excess insurance is that the former is between insurance companies (where the level of sophistication is usually superior and the

bargaining power is more equal), and the latter is between an insurer and insured (in which the insured receives the benefit of any doubt in the event an ambiguity exists).  That philosophy is summarized in the early case of *Southern Home Insurance Co. v. Wall*, 127 So. 298 (Miss. 1930):

> In construing the provisions of a contract of insurance, all the provisions of the policy must be so construed, if it can be reasonably done, so as to give effect to each.  Where the policy is subject to two interpretations, equally reasonable, that which gives the greater indemnity to the insured will prevail.  If one construction, looking to the other provisions of the policy, and to its general object and scope, would lead to an unreasonable result, such construction must be abandoned, and that construction adopted which will be more consistent with reason.  In all cases the policy must be liberally construed in favor of the insured, in order to accomplish the purpose of the insurance.

*Id.* at 299 (citations omitted).

At least in the world of the reinsurance contract, "[i]n interpreting ambiguous terms or clauses, . . . , it has been found that using industry custom and practice, as well as other forms of extrinsic evidence, is an appropriate mechanism of interpretation."  1A Couch 3d, *supra*, at § 9:15.

Unfortunately, neither Premier nor James River has given the Court much guidance as to these tools of contract interpretation.  The Court heard a lot at oral argument about the intentions of the parties.  Premier even attempted to offer what was intended by IRI, in a post-game quarterbacking sort of way, as to the WCO provision.  James River is adamant that it intended to exclude all manner of flood, in no less than four places in its policy.  The question is:  Did it?

## FACTUAL AND LEGAL ANALYSIS

Before tackling the pivotal issue, the Court will dispense with the WCO aspect of the case.  The WCO language is found in the IRI primary policy, which is a comprehensive all risk form insuring "against all risks of physical loss or damage, except as excluded . . . ."  The term WCO appears in a definitions section of general conditions, as well as in connection with an applicable deductible.  However, although the deductible refers to "each WCO as insured against by this policy," there is no insuring language in the policy for WCO such as there is, for example, with respect to loss due to certain acts of terrorism ("[T]his policy is conditionally extended to insure against . . ."), and a WCO is never identified as a separate peril.  If the IRI primary policy indeed insures "against all risks of physical loss or damage, except as excluded," the WCO provision is surplusage and merely dangles among the policy's other provisions (unless James River's assertion that it is tied exclusively to the deductible is accepted).  There is no express extension of coverage for a WCO.  At most, this might be an ambiguity in the primary policy between IRI and Premier that would be resolved in Premier's favor giving greater indemnity, but saddling James River with liability where it is not a party to that contract and based on that ambiguity is untenable, no matter what hindsight offered to explain IRI's intent.  The WCO

language is far too obscure to achieve this result.  Put another way, this might be viewed as triggering the limiting language of James River's "follow the form" provision that excludes broader coverage.  Further, even under IRI's Docks, Piers, Wharves Exclusion Revision (which excludes "loss or damage to docks, piers, wharves, and other property located thereon when caused by action of water or ice or impact of watercraft unless such loss or damage is caused by a [WCO] as defined elsewhere in this policy"), the casino barge is not specifically identified, and it is an inappropriate stretch to call it a dock, pier, wharf, or other property located thereon when it is actually another appurtenance to the water.  The Court rejects Premier's arguments in this regard.

This conclusion is not altered by Premier's reliance on *Northrop Grumman Corp. v. Factory Mutual Insurance Co.*, 2007 WL 2385134 (C.D. Cal. August 16, 2007), decided subsequent to the hearing held on the pending motions in the instant case.  Premier "believes that the opinion is persuasive authority .  .  . that a .  .  . WCO is a separate peril under the primary policy .  .  . and therefore a peril that James River .  .  . insured when it wrote its follow the form excess policy without including a specific exclusion for WCO."  The Court agrees with James River's assessment, at least on this particular issue, that "the *Northrop Grumman* opinion adds nothing to whether there was coverage for WCO under the IRI policy."  The most significant distinction is that Factory Mutual issued Northrop Grumman both the primary and excess policies that contained different and ambiguous coverage language.

The situation is different when it comes to unambiguous terms in the primary policy.  Despite the back-and-forth, take-and-give natures of IRI's policy, there is some symmetry to the destination it finally reached–exempting the casino barge from the flood endorsement exclusion.  However, as indicated above, it is not unheard of for an excess policy to not cover perils that are covered by the primary policy, even when the excess policy has "follow the form" language.

James River strenuously points to the identical definitions of "flood" in the primary and its own excess policy, and its logic is that

> if the IRI flood endorsement did not cover the casino barge initially, there would be no reason to except the barge from its "over water" exclusion.  By acknowledging that the casino barge is covered under the IRI flood endorsement, Premier has inadvertently admitted that the damage to the casino barge falls within the IRI definition of "flood."  Because the IRI definition of flood is identical to the James River definition of flood, the damage to the casino barge also must fall under James River's definition of "flood."  It is, therefore, excluded by the James River policy.

There is no question that IRI's and James River's policies both define flood in terms of "a general and temporary condition of partial or complete inundation of normally dry land areas," but even accepting James River's claim that "[i]t is undisputed that the tidal waters from Hurricane Katrina's storm surge created a 'temporary condition of partial or complete inundation of normally dry land areas' on the Mississippi Gulf Coast, and thus, a flood," it is difficult to draw a conclusion that the flood exclusion is clear and unambiguous and warrants a singular

interpretation that "[f]lood is defined in terms of a 'condition' that is 'general,' not in terms of a specific location or specific damage."   The IRI flood endorsement's explicit coverage of the casino building cannot be ignored, nor can the fact that James River's policy does not contain an express exclusion for it.  In other words, if IRI's and James River's basic policies arguably did not cover the casino initially, the IRI flood endorsement did, and if James River is to "follow the terms,  conditions, definitions and exclusions" of the IRI primary policy, then coverage attaches to the casino building under the terms of James River's policy.  The Court finds an ambiguity between James River's follow form language and unclear flood exclusion within its own policy, resulting in the James River policy giving merely co-extensive, not broader, coverage which is not excluded.

Prior to the issuance of the James River policy, it appears to be undisputed that its underwriter knew that Premier's property included a casino barge situated in/on water, regardless of what state law required.  It must also be presumed that the condition in James River's binder that it have a copy of the primary policy before issuing its own was met.  Under these circumstances, it appears that James River, to achieve clarity, should have expressly excluded the additional coverage to the casino barge, especially since everything else over the water was, for all practical purposes, excluded by the IRI primary policy.

In sum,

> [w]here there is doubt as to the meaning of an insurance contract, it is universally construed most strongly against the insurer, and in favor of the insured and a finding of coverage . . . . The basic reason that uncertainty is decided in favor of the insured is that the insurer prepares the policy and should not be allowed by the use of obscure or ambiguous exceptions to defeat the purposes for which the policy was sold . . . . Thus, "[i]n accord with the general standard of giving effect to the purpose of the contract, the rule is that provisos, exceptions, or exemptions, and words of limitation in the nature of an exception, are strictly construed against the insurer, where they are of uncertain import or reasonably susceptible of a double construction."

*Universal Underwriters Insurance Co. v. Buddy Jones Ford, Lincoln-Mercury, Inc.*, 734 So.2d 173, 176-77 (Miss. 1999)(citations omitted).

There may have been a certainty that covered property on normally dry land was excluded for the peril of flood, but that certainty is replaced by doubt for the casino building in/on the water.

However, this does not end the inquiry for summary judgment purposes.  James River points out that it is only seeking partial summary judgment because there are factual issues related to reformation of its insurance policy due to mutual or unilateral mistake.  The Court is aware of circumstances surrounding the payment by Premier of a different premium to James River for the policy it purchased.  James River attributes this lower premium to the requirement of a flood exclusion; Premier claims that it was the result of competition with other carriers.  It is noted that the IRI flood endorsement was "[i]n consideration of increased premium."  Despite

this Court's interpretation of the James River policy, it is unknown what discussions between the parties were held on this point; what other purposes they sought to achieve; or what their course of dealings was in connection therewith, including the entire underwriting history.  These questions of mutual intention, sophistication of the parties and their bargaining power, and negotiated terms of highly technical drafted contracts were discussed by the court in *Northrop Grumman, supra.*

The Court is even more concerned about payments made under the numerous other excess policies covering Premier's property and business operations.  The Court wants to make certain that exhaustion principles have been met as to any assumption of coverage by James River.  *See*, *e.g.*, *Federal Insurance Co. v. Srivastava*, 2 F.3d 98 (5th Cir. 1993).  This reservation is created by James River's reference to negotiated settlements by other carriers, rather than payments of full policy limits.

None of these issues was pressed at oral argument.  Premier's [52] motion to dismiss and [54] motion for judgment on the pleadings were converted [86] to motions for summary judgment, and the Court remains of the opinion that they are not appropriate for summary disposition at this time.

A separate order will issue.  Decided this the 3rd  of October, 2007.

s/ L. T. Senter, Jr.
L. T. SENTER, JR.
SENIOR JUDGE