IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

**PREMIER ENTERTAINMENT BILOXI**
**LLC d/b/a Hard Rock Hotel & Casino**
**Biloxi, a Delaware limited liability company**                    **PLAINTIFF**

**U.S. BANK NATIONAL ASSOCIATION,**
a national banking association, as Trustee
under Series A and Series B 10 ¾% First
Mortgage Notes Due 2012 Indenture dated
**January 23, 2004**                                                **PLAINTIFF-INTERVENOR**

**VS.**                                    **CIVIL ACTION NO. 1:06-cv-00012-LTS-RHW**

**JAMES RIVER INSURANCE COMPANY,**
an Ohio corporation                                                 **DEFENDANT**

**REPLY BRIEF IN SUPPORT OF**
**JAMES RIVER'S MOTION FOR SUMMARY JUDGMENT**

COMES NOW Defendant, James River Insurance Company ("James River"), and replies to Plaintiff Premier Entertainment Biloxi LLC's ("Premier") Rebuttal in Opposition to James River's Motion for Summary Judgment. [doc. 324]. As part of this Reply, James River incorporates its Motion and accompanying Memorandum in Support of its Motion for Summary Judgment or, in the Alternative, for Partial Summary Judgment [docs. 313 and 314][1]. Additionally, James River states as follows:

**I.   REFORMATION**

Premier argues that genuine issues of material fact exist as to whether the parties' reached an agreement as to James River's provision of flood coverage, but it offers no factual support. In

---
[1] Throughout this brief to avoid duplication, James River will make reference to the evidentiary materials attached as exhibits to James River's Motion for Summary Judgment [doc. 313]. They will be referred to as Ex. "__" to Motion.

fact, throughout its memorandum, Premier completely ignores that:

- **Premier's Vice President and General Counsel, Bob Calloway,** testified that the company's flood exposure was limited to $50 million and that insurers such as James River would not be required to cover flood unless they wanted to "throw" it in "for grins." Premier 30(b)(6), Ex. "5," at 29.

- **Premier's chief broker, Calvin Foster**, explained in his declaration that modeling revealed Premier's "probable maximum loss for damage" due to flooding was limited to $50 million, so excluding flood coverage from policies like James River's "was acceptable." Foster Decl., Ex. "4," at ¶ 19 and 34. Further, when Premier's broker, Shelly Hohimer, asked Mr. Foster to confirm the $50 million flood limitation, he wrote, "Shelly, we are limiting flood to $50 mil." Email from Shelly Hohimer to Calvin Foster dated July 19, 2005, attached as Exhibit "39" to Hohimer Depo, Ex. "9."

- **Premier's coverage counsel, Stephen Greenberg,** testified that James River and the other third layer carriers were not engaged to cover flood losses. Greenberg Depo., Ex. "14," at 29.

- **Shelly Hohimer, Premier's agent dealing directly with James River** testified that James River was specifically asked to exclude flood in exchange for a significant premium reduction. Hohimer Depo, Ex. "9," at 181-84, 193.

- **Nate Berns, another Premier agent dealing directly with James River,** understood James River was not going to cover "any flood." Berns Depo., Ex. "8," at 233-34.

Presented with these undisputed facts, Premier chooses to ignore them and instead argue unsupported theories. Rather than addressing all the testimony detailing the discussions and

subsequent agreement reached as to flood coverage, Premier incredulouly suggests there were no negotiations at all! (Response, at 19). It then attempts to convince the Court that it only requested a run-of-the-mill follow form policy and agreed to accept "whatever exclusions" James River wanted to include in it. (Response, at 3-4, 19). There is no evidence for this ridiculous position. The testimony – mostly from Premier's own witnesses – proves that Premier knew exactly what it wanted with respect to flood coverage, and did not want to pay the price for the added flood coverage in James River's policy. Hohimer Depo., Ex. "9," at 181-82.

Premier spends an inordinate amount of time arguing that regardless of the understanding that the policy would exclude flood, James River intended to use its form flood exclusion placed in the policy. (Response, at 3, 4, 5-8, 18-30). James River never has denied this. However, Premier misses the point. Reformation is allowed when the documents (here, the policy and its language) do not meet the agreement reached between the parties (here, insurance for risks excluding flood). The *Johnson v. Consolidated Am. Life Ins. Co.* case cited by Premier makes James River's point precisely. "The mistake that will justify a reformation <u>must be in the drafting of the instrument</u>, not in the making of the contract." *Johnson,* 244 So.2d 400, 402 (Miss. 1971) (emphasis added). What Premier misses is that the mistake was not in selecting the form flood exclusions, but rather in believing that the form would accomplish the agreement by excluding all flood coverage, even coverage of the casino.

James River quoted the policy based on the schematic offered by Premier's agent, Shelly Hohimer. That schematic (consistent with all the communications up to that point) requested that James River provide coverage in the second excess layer <u>excluding flood and quake</u>. Email from Shelly Hohimer to Ann French, dated August 3, 2005, attached as Exhibit "21" to Hohimer Depo., Ex. "9." James River bound coverage on that understanding. French Decl., Ex. "3," at ¶ 5. At that point, the contract was made. It is undisputed that the policy (the instrument

reflecting the agreement) was not issued until weeks after the hurricane. It contained numerous flood exclusions which were to reflect the parties' agreement. *Id.* As Ms. French testified, she believed that the policy clearly and unambiguously excluded all flood coverage. A. French Deposition, Exhibit "A," at 112; A. French Supp. Declaration, Exhibit "B," at ¶ 4. Because this Court found, after carefully comparing James River's to the IRI policy, the flood exclusion possibly ambiguous, thus opening the door to inferences of flood coverage,[2] Ms. French might be mistaken in her belief. Clearly, if the policy is to be construed to cover the casino for flood, an error was made in the drafting of the document because the parties' agreement never contemplated flood coverage of any kind. *Johnson* and cases like it find these circumstances ripe for reformation.

Premier contends that James River did not make a "mistake in drafting" because it selected the form and flood exclusion. (Response, at 21). Again, Premier misses the point. To the extent the flood *exclusion* used by James River is ultimately turned inside out to provide flood *coverage* for the casino, which is clearly contrary to the parties' agreement, a mistake was unquestionably made. Premier cites testimony from Ann French in support of its theory that "no mistake occurred." (Response, at 6). However, the very language cited by Premier highlights that when James River was attaching its flood exclusion, the language would exclude "all flood." (Response, at 7). This was at the heart of the agreement between the parties and acknowledged by Premier's agent. Berns Depo., Ex. "8," at 233-34. Interpreting the policy as providing coverage for flood when clearly none was ever meant to exist only frustrates this agreement.

After failing to explain that no mistake occurred, Premier finally concedes that the flood

---

[2] Premier repeatedly misstates the Court's Memorandum Opinion [doc. 291] and argues that the James River policy was found to provide flood coverage for the casino. To be clear, the Court found some ambiguity with respect to the language used in James River flood exclusion as compared to the language found in the IRI flood endorsement. It never held that the James River policy would be construed to provide flood coverage to the casino. Rather, it stated that there was a potential ambiguity.

exclusion selected was due to "James River's neglect." (Response, at 22). Nevertheless, it inequitably tries to seize on the mistake by demanding coverage where none existed. *Id.* All at once, Premier justifies the conditions required to reform the agreement through unilateral mistake. *See McCoy v. McCoy,* 611 So. 2d 957 (Miss. 1992).

The facts make clear the parties' agreement. Only through unusual circumstances is there a possible ambiguity in the flood exclusion, because throughout the negotiations, the parties understood that when James River was asked to exclude flood, it was not going to cover "any flood." Berns Depo., Ex. "8," at 233-34. If ambiguity can be used to create flood coverage for the casino, the parties' agreement is left unsatisfied. Only reforming the maligned document to enforce the flood exclusion in conformance with the parties' understanding will uphold the agreement reached. The parties' exact intentions have been made clear – no flood coverage was ever intended, by either party. Reformation is therefore appropriate. *See U.S. Fidelity & Guar. Co. v. Gough*, 289 So. 2d 925 (Miss. 1974) ("The purpose of reformation is to grant to each of the parties exactly what they intended when their agreement was made.")

## II. BAD FAITH

Premier spends the balance of its argument distorting the facts and arguing unsupported legal theories to suggest that James River acted in bad faith. Despite its rhetoric, Premier comes up empty. This is not a case where punitive damages are appropriate. First, the Court's previous Memorandum Opinion [doc. 291] made clear that James River was absolutely justified in denying Premier's claims based on the contrived "WCO coverage" theory. Additionally, the Court's reading of a possible ambiguity in the flood exclusion finds by definition two *reasonable* interpretations, which creates James River's arguable basis to dismiss Premier's bad faith claim. Moreover, given the repeated discussions asking James River to exclude flood coverage in exchange for a lower rate, there was a legitimate reason for James River to act accordingly and

interpret the policy to exclude flood. The law is clear. So long as James River had at least an arguable basis to deny the coverage for the casino barge, bad faith cannot exist. *Windmon v. Marshall*, 926 So. 2d 867, 872 (Miss. 2006). Considering this evidence, no further analysis is needed to dispose of the bad faith issue as a matter of law.

To distract the Court from this logical conclusion, Premier tests various theories in hopes something will keep the jackpot of a bad faith claim alive. Their theories are both legally unsupported and factually incorrect.

First, Premier claims that because their damages were projected to exceed $181 million in early estimations following the storm, James River should have immediately paid its policy limits. (Response, at 9). This claim is absurd. The damage "estimates" cited were never finally confirmed before Premier filed its lawsuit. Gilbane 30(b)(6) Depo., Exhibit "C," at 126, and K. Flaherty Depo., Exhibit "D," at 152-54. Additionally, the estimations had nothing to do with <u>covered losses</u>, but merely with total damages.[3] Gilbane 30(b)(6) Depo., Exhibit "C," at 140, and K. Flaherty Depo., Exhibit "D," at 152. Regardless of these preliminary calculations, James River had no obligation to pay Premier until all the policies in the first two layers had been exhausted, which proved to be in late June 2006. *See* James River policy at Excess Property Coverage Form (Following Form), Page 1 of 4, Ex. "16" ("This Policy will apply only after the primary and underlying insurer(s) have paid the full amount of their respective 'ultimate net loss' liability as set forth herein."); *see also* Premier's 30(b)(6) Depo., Ex. "5," at 78; Paul Amoruso Depo., Ex. "10," at 80-81.

---

[3] Throughout this litigation, Premier has attempted to claim that all its damages were covered under the manufactured "WCO" theory. They have followed this strategy by suggesting that all damages caused by Hurricane Katrina were covered. However, Premier's coverage only included what was expressed in James River's policy. James River's policy did not include the "WCO coverage" Premier ridiculously claimed. Thus, Premier's argument that James River should have paid policy limits immediately upon the finding that all damages exceeded policy limits is not sustainable.

Premier later inflates the initial $181 million estimate to $199 million and later $229 million in an attempt to sensationalize its losses and overstate its case. As stated above, Premier's speculative losses do not automatically create <u>covered</u> <u>losses</u>. Moreover, these losses are still in dispute. *Compare* A. Campbell's findings for property damage apportionment from wind and flood damage, March 29, 2007 Report, Exhibit "E," at 13, *with* H. Seawell's findings, March 10, 2006 Report, Exhibit "F," at 5; *and* D. Wengler's calculation of business income losses, March 30, 2007 Report, Exhibit "G," at 13-14, *with* C. Nicholson's estimates, January 5, 2007 Report, Exhibit "H," at 5.

James River's experts reviewed Premier's analysis and found it, like Premier's account of the WCO language, unsupportable. For example, Premier's engineering expert, Henry Seawell, and James River's, Alan Campbell, generally agreed that the casino was constructed to withstand 140 mile per hour winds, but was not constructed to withstand the flood levels which accompanied Hurricane Katrina. A. Campbell March 29, 2007 Report Exhibit "E," at 3, and H. Seawell Depo., Exhibit "I," at 72-73, 140. Assessing the damage to the casino, Premier's engineering expert assumed a tornado within the hurricane must have appeared and hit the casino barge (but not the connected hotel building) and caused vast amounts of wind damage before the surge. H. Seawell January 8, 2007 Report, Exhibit "J," at 2; Seawell Depo., Exhibit "I," at 159. James River's experts found this tornado theory incredible. In fact, Richard Henning, Premier's weather expert, was not quite convinced himself. He testified that while a tornado was possible in the casino's general area,[4] he never told Mr. Seawell that a tornado hit the casino and one was never actually reported by the National Weather Service in the area. R. Henning Depo., Exhibit "K," at 32-33, 36. Mr. Henning explained that the severity of the damage caused by the storm

---

[4] Mr. Henning explained that he was unable to "produce wind damage evidence in a place like the Hard Rock because of the storm surge doing so much to the property." R. Henning Depo., Exhibit "K," at 92.

surge prevented a conclusion that a tornado hit the Hard Rock. *Id.*, at 92. James River's expert clearly had an arguable basis to dispute Premier's theory on wind damages which seemingly only affected the casino.

This dispute between wind and water damage spills over to the business interruption calculations as well. Given the flood damages to the casino (and Premier's desperate attempts to call them wind damages caused by a targeted tornado), the revenues stemming from this facility creates drastic swings in the amount of losses actually covered and those claimed by Premier. Given James River's arguable position that the casino was destroyed by the flooding, which it was in no way designed to withstand, its business interruption expert has different estimations of covered losses than Premier's. Premier is demanding in excess of $105 million in business interruption damages. (Response, at 18). James River concludes that total business income losses equal $48,212,878, and that the covered portion of these losses are $3,539,454 and $370,647 for the hotel and lounge respectively. D. Wengler March 30, 2007 Report, Exhibit "G," at 14. Moreover, the $105 million business income loss claimed is almost twice the $56,500,000 declared business income statement of values upon which the James River policy was issued and to which Premier is limited under the James River Policy. Premier's Statement of Values, Bates No. AJG 001112, Exhibit "L;" James River Policy, Ex. "16," at Occurrence Limit of Liability Endorsement, Page 1 of 1. The fact that a pocketbook dispute exists does not mean this case is ripe for a bad faith claim. Indeed, considering James River's continued attempts to rectify the difference and settle the claim,[5] just the opposite is established.

Premier's suggestion that it continues to be damaged to the amount of $229 million illegitimately attempts to create an issue for bad faith where none exists. (Response,

---

[5] James River has repeatedly attempted to settle this claim. It even offered Premier $5 million, greatly in excess of what it believes is due given the clear exclusion of flood damage and the dismissal of the "WCO" theory. It has also requested mediation in advance of trial. All these efforts have been quickly refused and accompanied with demands for no less than full policy limits.

throughout). James River and the other insurers have provided Premier with sufficient funds to completely restore its facility to its original condition, to keep it operating, cover its debt service <u>and</u> even to pay off all of its Pre-Katrina construction costs. *See* Premier's Disclosure Statement, *In re Premier Entertainment Biloxi LLC*, Case No. 06-50975, dated December 11, 2006, attached hereto as Exhibit "M."

As for the business interruption portion, Premier claims $105,604,482 is attributable to losses through June 2007. (Response, at 18). James River absolutely contests liability for this claim. A cursory review of the two lawsuits Premier filed against U.S. Bank make very clear that U.S. Bank's conduct caused Premier to postpone its re-opening for well over a year. <u>See</u> Complaint filed in *Premier Entertainment Biloxi, LLC v. U.S. Bank National Association, et al.,* No. 1:05-cv-00683 (S.D. Miss. Filed Dec. 16, 2005), at 8, ¶ 43, attached hereto as Exhibit "N." James River is not responsible for the business income losses over this period. Premier clearly acknowledged this when demanding that U.S. Bank release its insurance proceeds. *See* Letter from Robert Callaway to U.S. Bank dated October 20, 2005, at 3, PRE-07548-07550, attached hereto as Exhibit "O."

As further evidence of James River's good faith, James River has repeatedly asked Premier to explain and substantiate its ever-changing damage estimates. *See* Letter from Bill Brabec to Premier c/o Ben Stone, dated August 3, 2006, Ex. "11," at p. 5; Letters from Bill Brabec to Ben Stone dated October 25, 2006, and April 16, 2007, Exs. "12" and "13," respectively. Rather than cooperate, Premier withheld these figures in what can only be seen an attempt to manufacture a bad faith claim to inflame the jury and drag out the trial.

James River has reevaluated its obligations to adjust the claims despite Premier's preposterous claims. (Response, at 12-14). As detailed in its initial Memorandum in Support of the pending motion [doc. 314], James River continued to assess and offer payments to Premier as

information became known.  On August 3, 2006, James River paid close to $1 million for its share of undisputed wind damage, and close to $30,000 for its share of wind damaged contents.  It has twice since paid Premier over $360,000 with payments on October 25, 2006, and April 16, 2007.  However, despite James River's continued attempts to obtain facts upon which to property assess the damages, Premier has blocked James River's efforts and demanded only full policy limits.  To the extent Premier has been dissatisfied with the timing of the payments, it has only itself to blame for refusing to cooperate in good faith.

Premier concludes its Response by demanding that it is entitled to recover full policy limits "under all potential theories." (Response, at 16-18).  Whatever this means, Premier offers no law to support it.  Contrary to Premier's "all potential theories" notion, the policy at issue requires James River to pay <u>at most</u> 11% of the third layer of coverage, not to exceed $14 million, subject to its limitations.  James River policy, Ex. "16."  The companies with whom Premier settled claims in the third layer did not specify which portions of the amounts settled were allocated to which claims and none paid policy limits.  *See* Premier 30(b)(6), Ex. "5," at 77-83.  In determining its liability, James River appropriately allocated the payments made for wind damages and water damages on a pro-rated basis.  It is not altogether clear whether Premier is attacking this basis in its "all potential theories" argument.  It is clear that after heavily researching the issue, Premier's coverage counsel could find nothing to suggest James River's allocation method was improper.  Greenberg Depo., Exhibit "P," at 83.  Likewise, Premier has cited no authority in its rebuttal to establish that pro-rata allocation was improper.  Without evidence or law showing James River's allocation method was in bad faith, Premier's theory must be dismissed.

James River has at all times acted fairly and in good faith with Premier.  From underwriting to the claims handling process, James River has honored its agreement and acted to

quickly resolve Premier's losses. Premier is attempting to gain an undue benefit of a deal to which it did not bargain by claiming that the policy was "ambiguous," one that it would certainly not honor on the floor of its gaming facility. Premier gave James River specific instructions to exclude flood from its policy so that Premier could save 50% off of its premium expense. James River did just that. It has since done everything reasonably possible to honor its commitment and adjust Premier's claim. However, Premier's attempt to stonewall these efforts and increase its odds of getting a jackpot award from the jury has frustrated the work to resolve this claim. There are no facts to suggest this case can be set up to allow punitive damages. For these reasons, reformation should be ordered and Premier's bad faith claim dismissed.

WHEREFORE, PREMISES CONSIDERED, James River Insurance Company respectfully moves the Court to enter a summary judgment reforming the policy to exclude all flood coverage and dismissing Premier's bad faith claims.

Respectfully submitted, this the 12th day of December, 2007.

JAMES RIVER INSURANCE COMPANY

By: s/ William C. Brabec
    Its Counsel

OF COUNSEL:

William C. Brabec (MS Bar No. 4240)
John S. Hooks (MS Bar #99175)
David W. Donnell (MS Bar #100731)
ADAMS AND REESE LLP
111 East Capitol Street, Suite 350 (39201)
Post Office Box 24297
Jackson, Mississippi 39225-4297
Telephone: (601) 353-3234
Facsimile: (601) 355-9708

**CERTIFICATE OF SERVICE**

I certify that I have this date electronically filed the foregoing with the Clerk of Court using the ECF system which sent notification of such filing to the following:

Jonathan P. Dyal (jdyal@balch.com, dslusher@balch.com)

Michael Clark McCabe, Jr. (mmccabe@avchlaw.com, mmcc3@aol.com)

Ben H. Stone (bstone@balch.com, bwatkins@balch.com)

Paul J. Delcambre (pdelcambre@balch.com)

Robert D. Shoecraft (rshoecraft@sbcivillaw.com)

and by other means to:

James F. Killian
Maslon, Edelman, Borman & Brand, LLP
3300 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-4140

This the 12th day of December, 2007.

                                                           s/ William C. Brabec